Harry S. Davega v. Commissioner. Dorothy R. Davega v. Commissioner.
Harry S. Davega v. Commissioner
Docket Nos. 30506 and 30507.
United States Tax Court
1952 Tax Ct. Memo LEXIS 278; 11 T.C.M. (CCH) 290; T.C.M. (RIA) 52085; March 31, 1952
*278 D. Nelson Adams, Esq. 15 Broad St., New York, N. Y., and Wallace S. Jones, Esq., for the petitioners. John J. Madden, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: This proceeding arises out of respondent's determination of deficiencies in income tax for 1945. Certain adjustments are not contested. The taxes in controversy are in the amount of $9,721.31 with respect to petitioner Harry S. Davega, and $12,046.59 with respect to petitioner Dorothy R. Davega. The sole issue is whether petitioners, husband and wife, are each taxable on one-half of the income of an enterprise in which petitioner Harry S. Davega was denominated a 10 per cent partner with his daughters holding the remaining interest. Some of the facts were stipulated. Findings of Fact The stipulated facts are hereby found accordingly. Petitioner Harry S. Davega, hereinafter called petitioner, filed his return with the collector for the second district of New York. Petitioner Dorothy R. Davega, hereinafter called petitioner's wife, filed her tax return with the collector for the district of Connecticut. Prior to 1935 petitioner had retired from his business *279 career with the Davega Sporting Goods Stores and had invested in real estate in New Jersey. His wife had been a housewife. Prior to that year he suffered loss of income during the depression and he decided to resume business activity. The three children of petitioner and his wife are Dorothy, born November 6, 1914; Ruth, born April 2, 1918; and Patricia, born June 19, 1924. In 1935 petitioner and his wife formed a corporation which purchased the White Turkey Inn in Danbury, Connecticut, each owning 50 per cent of the outstanding stock. Their financial resources were limited and some undisclosed portion of the cash used for the purchase of the inn was taken from their children's funds. The two elder daughters assisted in the operation of the inn by acting as waitresses, hostess, or cashier. Ruth managed the inn during the winter of 1937-1938, and she worked also at the Old Hundred, a country inn, and at Stoddard's Restaurant in Butler Hall, New York City. In the third year of operation a severe hurricane cut off business. The inn did not reopen in 1943 after its usual winter closing. It remained closed during the continuation of gas rationing, reopening shortly thereafter. On October 15, 1938, petitioner *280 and his wife incorporated White Turkey Town House, Inc., under the laws of the State of New York, to operate a restaurant in New York City. Each owned 50 per cent of the outstanding stock. During the years 1939 through 1944 that corporation operated a restaurant known as the White Turkey Town House at 1 University Place, New York City. During the years 1944 and 1945 petitioner was president and his wife was secretary of the corporation. In 1941 petitioner and his wife opened a restaurant, known as White Turkey Murray Hill, at 220 Madison Avenue, New York City, which proved to be very successful. It was operated first as a corporation and subsequently became a partnership. In 1944 they formed a corporation to operate a restaurant at 12 East 49th Street, New York City. In 1949 they opened a restaurant at 57th Street and 2nd Avenue, New York City. The general procedure which petitioner and his wife have evolved and now follow with respect to their restaurants is for petitioner to supervise financial matters, advertising and purchasing of liquors and some foods, while his wife supervises decorrating, menus, and personnel. The tax returns of White Turkey Town House, Inc., for its taxable *281 years ending on November 30, show for 1939 net loss of $543.36, and no officers' salaries; for 1940 net income of $105.63 and officers' salaries of $4,200; for 1941 net income of $242.97 and officers' salaries of $5,625.76; for 1942 net loss of $5,034.02 and officers' salaries of $600.85; for 1943 net income of $6,524.50 and no officers' salaries; and for 1944 net income of $7,017.34 with officers' salaries of $12,000. During 1944 petitioner made efforts to sell the restaurant and listed it for sale with several real estate brokers. One potential purchaser who owned another restaurant in the neighborhood and who was interested in the location but did not desire to purchase the good will or trade-name, rejected an offer to sell the assets for approximately five to seven thousand dollars, objecting to the rental and to the cost of necessary improvements of kitchen equipment. No purchaser was found at a satisfactory price. In the early fall of 1944 petitioner and his wife discussed with their two elder daughters the possibility of the latters' purchasing the White Turkey Town House. Both daughters were then married. Ruth had married in 1940 and for a time her husband, Bolton, had *282 worked at the restaurant. Later they moved to Washington, and thereafter he entered the armed service. In 1944 Ruth was living in Halifax, Nova Scotia. Subsequently petitioner and his daughters, Dorothy and Ruth, decided to form an arrangement, denominated a partnership, if an extension could be obtained of the lease on the premises which was due to expire on November 30, 1944. On September 29, 1944, a lease for the premises at 1 University Place at an annual rental of $13,000, for the year ending November 30, 1945, was executed on behalf of White Turkey Town House, Inc., by petitioner. In a guaranty, dated the same day and attached to the lease, full performance of all the covenants and conditions of the lease was guaranteed by petitioner and his wife. The lease contained, among other matters, the following provisions: "The Tenant further represents that all of the outstanding shares of the stock of said WHITE TURKEY TOWN HOUSE, INC. are owned and held by HARRY S. DAVEGA and DOROTHY R. DAVEGA. "It is further understood and agreed that this letting is made upon the condition that throughout the term of this lease not less than two-thirds of the then outstanding shares of the *283 stock of said WHITE TURKEY TOWN HOUSE, INC. shall be then owned and held by said HARRY S. DAVEGA and DOROTHY R. DAVEGA and/or either of them; if at any time during said term said HARRY S. DAVEGA and DOROTHY R. DAVEGA and/or either of them shall not then own at least two-thirds of the then outstanding shares of the stock of said WHITE TURKEY TOWN HOUSE, INC. then and in such event the Tenant shall be deemed in default under the terms of this lease and the Landlord shall have and be entitled to the same rights and remedies under and with respect to this lease as if such default were with respect to rent originally reserved under this lease. "It is further understood and agreed that this letting is made upon the further condition that said HARRY S. DAVEGA and DOROTHY R. DAVEGA and/or either of them shall not at any time during said term sell, assign, or pledge the shares of the stock of said WHITE TURKEY TOWN HOUSE, INC., or any part of such shares, nor place in trust such shares or any part thereof, nor execute any trust agreement relating to such shares or any part thereof, nor enter into any other arrangement which shall or may give control of said corporation known as the WHITE *284 TURKEY TOWN HOUSE, INC. to any other party or parties, without the prior written consent of the Landlord in each instance; any such sale, assignment, pledge, trust, trust agreement, or other arrangement which shall or may give control of said corporation WHITE TURKEY TOWN HOUSE, INC. to any other party or parties, without the prior written consent of the Landlord in each instance, shall be deemed an assignment of this lease and therefore in violation and a breach of its terms. * * *
"46. The Tenant hereby covenants and agrees that throughout said term said HARRY S. DAVEGA and DOROTHY R. DAVEGA will be active in the supervision and management of the Tenant's restaurant in said demised premises. A violation of the provisions of this paragraph shall be deemed a default by the Tenant under the terms of this lease and in such event the Landlord shall have and be entitled to the same rights and remedies under and with respect to this lease as if such default were with respect to rent originally reserved under this lease. Mention in this paragraph of any particular remedy shall not preclude Landlord from any other remedy in law or in equity. "47. The Tenant hereby covenants and agrees *285 that neither the Tenant nor HARRY S. DAVEGA nor DOROTHY R. DAVEGA, nor any one or more of them, nor all of them will at any time during the term of this lease, open or cause to be opened, or operate or cause to be operated, either directly or indirectly, another restaurant in the area bounded on the south by Canal Street, on the north by 23rd Street, on the east by the East River, and on the west by the Hudson River. A violation of the provisions of this paragraph shall be deemed a default by the Tenant under the terms of this lease and in such event the Landlord shall have and be entitled to the same rights and remedies under and with respect to this lease as if such default were with respect to rent originally reserved under this lease. Mention in this paragraph of any particular remedy shall not preclude Landlord from any other remedy in law or in equity." An instrument dated January 2, 1945, was executed by petitioner and his daughters, Dorothy and Ruth. It stated that the parties had formed a partnership to continue the business of White Turkey Town House. It provided that petitioner's interest in the firm should be 10 per cent, while each of his daughters was to have a 45 per *286 cent interest. A provision of the agreement provided that no partner should be entitled to receive a salary or to withdraw any portion of the profits except upon the unanimous consent of all the partners. The instrument further provided that in the event of a sale of assets, the name and good will should not be sold, and that the right to use the name White Turkey and the good will attendant upon the use of such name should revert to petitioner and his wife who had licensed the use of such name. A bill of sale executed on February 1, 1945, by petitioner's wife as secretary and treasurer of White Turkey Town House, Inc. stated that the corporation had sold to petitioner and to his daughters Dorothy and Ruth, all of the merchandise and equipment used in connection with its restaurant business for a consideration of $6,946.20, plus the catalog price of all food and liquor, less business debts. The instrument provided that the sale included the right to use the name White Turkey for the term of one year from March 1, 1945, and for such further time as might be consented to by the seller and petitioner and his wife. No part of the consideration was for good will or use of the name White *287 Turkey. The net amount paid was $2,920.78. Petitioner did not need money. The balance sheet of White Turkey Town House as of January 1, 1945, shows petitioner's capital as $292.18, and the capital of each of his daughters as $1,314.80. The latter amount was contributed by each daughter. At that time Ruth had at least $6,000 in bank accounts. On February 1, 1945, a Certificate of Conducting Business was filed in the Office of the County Clerk in New York, New York. The certificate was executed by Dorothy, Ruth, and petitioner, and it stated that they intended to transact business under the name of White Turkey Town House at 1 University Place. An Assignment of Lease dated January 29, 1945, was executed by petitioner's wife for White Turkey Town House, Inc. It assigned the lease to the restaurant premises at 1 University Place to Dorothy, Ruth and petitioner, as co-partners. A Consent to Assignment, dated January 31, 1945, executed by the landlord of the premises at 1 University Place, University Place Apts., Inc. stated that the landlord consented to that assignment. The instrument provided that White Turkey Town House, Inc., was not released from liability, and that petitioner *288 and his wife remained liable under the guaranty dated September 29, 1944. On January 1, 1945, the eldest daughter Dorothy, was living in Newark, New Jersey, and Ruth was living in Halifax, Nova Scotia. In early 1945 Dorothy moved to New York City, where she purchased a house on East 55th Street in which subsequently she resided. Ruth returned from Halifax in June 1945, and thereafter she remained for a time in New York City. By 1945 Dorothy and Ruth each had had two children. During the period January 1, 1945, to September 30, 1945, the White Turkey Town House restaurant was supervised by the same manager who had previously been in charge. The personnel had been trained by petitioner's wife. The same pattern of operation of that restaurant which she had established, including decoration, food and menus, was followed. She lived in the same building, frequently visited the restaurant, and occasionally was consulted on problems of management. Petitioner supervised certain matters, such as finances, advertising and liquor controls, and he gave some directions respecting food purchasing. During that period petitioners' daughters, Dorothy and Ruth, were occupied with family affairs *289 and they did not take an active part in the business. They examined the weekly or bi-weekly reports of the Willmark Service on the quality of service in the restaurant and the monthly and annual financial statements prepared by an accountant. In the summer of 1945, during her residence at 1 University Place, Ruth observed the operation of the business, and she was instrumental in obtaining as employees several waitresses who had worked with her at Stoddard's Restaurant. During 1945 petitioner and his wife were operating their restaurant enterprises at 12 E. 49th Street and 220 Madison Avenue. She made her headquarters at the former address, while he functioned from the latter restaurant, where he maintained his central office. During that year petitioner and his wife included in their advertising the address of the White Turkey Town House, for which the latter company paid $100 per month during approximately the first half of the year and $400 per month during the remainder of the year. The advertising was arranged by petitioner and the amount charged was determined by petitioner and his accountant, taking into account the volume of business of the several restaurants. No payment *290 was made for use of the name White Turkey. During the period January 1, 1945, to September 30, 1945, petitioner, his wife, Morris Wasson and M. N. Tavlin had authority to sign checks on the bank account of White Turkey Town House. Tavlin was an accountant employed by petitioner and his wife in connection with their restaurant enterprises. Wasson was a bookkeeper at the restaurant at 220 Madison Avenue. Neither of the daughters, Dorothy nor Ruth, had authority to sign checks. Most of the checks were signed by petitioner. A few checks were signed by petitioner's wife when he was out of town. During the period January 1, 1945 to September 30, 1945, profits of White Turkey Town House were distributed in the approximate amounts of $2,000 to petitioner, $4,000 to Dorothy, and $2,000 to Ruth. The sums distributed to Dorothy and Ruth were under their independent control after distribution. The partnership return of White Turkey Town House for the fiscal year January 1, 1945 to September 30, 1945 reported gross receipt of $231,087.70, gross profit of $127,972.58, and ordinary net income of $31,290.79, with distributive shares in the amount of $3,129.09 to petitioner, and $14,080.85 each *291 to Dorothy and Ruth. One of the causes for the increased earnings of the taxable year was gas rationing which prevented travel to country restaurants. An instrument dated September 29, 1945, executed by petitioner and his daughters, Dorothy, Ruth and Patricia, stated that they had formed a partnership to continue the business of White Turkey Town House at 1 University Place. Its provisions were similar to the agreement dated January 2, 1944. The instrument provided that petitioner's interest in the capital and profits should be 10 per cent, while each of his daughters should have a 30 per cent interest. Its purpose was to give the youngest daughter, Patricia, the same interest as her sisters, by reducing the interests of Dorothy and Ruth. Patricia has never made any payments to her sisters for that interest. During the period following the taxable years, the net income from the White Turkey Town House for its fiscal years ending on September 30, was $28,611.26, $17,355.05, and $8,044.60, for the years 1946, 1947, and 1948, respectively. The restaurant closed in 1948. Under an instrument, dated February 1, 1949, which stated that they owned the trade-name "The White Turkey," and *292 that they had sold the stock of the corporation operating the White Turkey Inn at Danbury, Connecticut, to Henry F. and Ross M. Freund, petitioner and his wife granted to the purchasers a "limited license" to use the name "The White Turkey." For a period of two years, so long as they continued to use the name, the licensees agreed to pay one per cent of their gross receipts from the restaurant, while for the same period petitioner and his wife agreed to include the address of that restaurant in their advertisements. Petitioner's tax return for 1945 reported adjusted gross income of $49,224.75, consisting of $15,600 in salary from White Turkey - 49th Street, Inc., $648.19 in dividends and interest, $29,880.23 and $3,129.09 as his distributive share from the partnerships of White Turkey Murray Hill at 220 Madison Avenue and White Turkey Town House, respectively, less a net loss of $32.76 from the sale of capital assets. The return of petitioner's wife for 1945 reported adjusted gross income of $45,538.23, consisting of $15,600 in salary from White Turkey - 49th Street, Inc., $58 in dividends and interest, and $29,880.23 as her distributive share from the partnership of White Turkey *293 - Murray Hill. Respondent's notices of deficiency to petitioner and his wife determined in each case, among other matters, that "* * * the net income from the partnership of White Turkey Town House for the period January 1, 1945 to September 30, 1945, should be included in your income to the extent of 50% thereof * * *" Petitioner Harry S. Davega did not truly intend to join together with his daughters, Dorothy and Ruth, in good faith and with business purpose to enter into partnership. Petitioners Harry S. and Dorothy R. Davega were the actual persons who jointly controlled and operated the White Turkey Town House restaurant. Opinion Only if the generally accepted rules for determining the attribution of income do not apply for some reason [1] to family partnerships, can petitioners prevail. The income was earned by their supervisory services, and by assets preponderantly contributed by them. The business was under their control and its proceeds were not available to the other putative partners without petitioner's consent. . The future of the arrangement was dominated by petitioners, as indicated by its subsequent *294 transformation in order to take from the two elder daughters, without compensation, a share for their youngest daughter when she arrived at the proper age. The lease was conditioned on a guarantee by petitioners, and apparently would not have been available to the alleged partners in its absence. See . The restaurant was assessed for a portion of the advertising charges incurred on behalf of petitioners' combined enterprises without any consultation with the daughters as to liability or amount. The trade name presumably carrying the good will was owned by petitioners, and nothing was paid for its use. The business was a mere continuation of that owned and operated by petitioners. , affirmed (per curiam) (C.A. 2), , certiorari denied, . That the arrangement was properly evidenced by all of the formal elegances requisite to make it a legal relationship, and that some distribution of earnings was actually made to the daughters which they were then free to use will not suffice *295 to support the alleged partnership. , affirmed (C.A. 4), . The same would be true of any other gift of income already earned. See ; ; . The arrangement is not defended by reason of any services rendered by the daughters, and the comparatively small capital amounts paid by the daughters was used to make payments to petitioners, and did not help the business. Petitioner, on the other hand, conceded that he had no need of funds, a concession amply sustained by such circumstances as that the earnings of the b4siness for the first year were more than ten times the amount of the daughters' cash investment, and that the principal income-producing assets consisted of good will, business location, and trade name, all of which belonged to and had been and continued to be contributed by the two petitioners. . The ostensible reason for introducing the daughters into the cast of characters was to permit them to learn the restaurant *296 business. Yet, in the same breath petitioners insist that the restaurant in question ran itself; that no services were required of any member of the family; and that, in fact, even petitioners did not contribute anything appreciable to the management of the enterprise. This is not to say that petitioners' overly modest estimate of their own services can be accepted on this record. While they may have given a comparatively small amount of their time and attention to that one restaurant, at its own location, the testimony makes it clear that petitioner Harry Davega managed finances and advertising from his central office, from which also he supervised to some extent the purchase of liquor and some foods, while petitioner Dorothy Davega was always available for consultation on management problems of the restaurant, the manager and personnel having been trained by her, the furnishings and decorations having been selected by her, and the method of operation with respect to matters such as menus and type of food to be served, all following the pattern which she had established. In this the case departs radically from such patterns as those in ; *297 ; and . Of these contributions the restaurant involved in the present controversy was at all times the beneficiary. , affirmed (C.A. 7), . Were we at liberty to allocate the earnings of the business between a proper amount for the services and income-producing assets contributed by petitioners and a return on the capital originating with the daughters, the case might be less difficult. This we are not permitted to do. . reversing ; cf. Revenue Act of 1951, section 340 (b). In the absence of such an allocation and being satisfied that as of the year 1945 the predominant characteristics of the earning and control of income should determine the location of its burden for tax purposes, we conclude that this income was that of petitioners, and that when it was received by the daughters it was in the nature of a gift upon which not they but the true owners are taxable. Decision will be entered for the respondent. Footnotes
1. Cf. Revenue Act of 1951, section 340.↩